IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TRACY ANDERSON,

                         Plaintiff,                      OPINION & ORDER

      v.

                                                     13-cv-627-wmc

DR. PAUL SUMNICHT,
BELINDA SCHRUBBE and
SGT. LENTZ,

                         Defendants.

      *Pro se* plaintiff Tracy Anderson injured his knee playing basketball in March of 2012, while incarcerated at Waupun Correctional Institution.  Over the next two years, he underwent a variety of medical treatments, with limited success, before finally receiving surgery to repair a torn anterior cruciate ligament, or ACL, in January of 2014.  Anderson then filed suit against numerous correctional officials, claiming that they failed to provide him with adequate medical care in violation of the Eighth Amendment.  Under 28 U.S.C. § 1915A, Anderson was ultimately granted leave to proceed on claims that: (1) Dr. Paul Sumnicht treated his knee injury inappropriately by refusing to order an MRI; (2) Dr. Sumnicht and Belinda Schrubbe unreasonably delayed in ordering a knee brace for him; (3) Belinda Schrubbe unreasonably delayed in scheduling his surgery; and (4) Sgt. Jolene Lentz refused to give him the medical ice he had been prescribed or to contact medical staff when Anderson's knee gave out.  Defendants have moved for summary judgment.  (Dkt. #40.) For reasons explained further below, the court will grant that motion with respect to the claims against Dr. Sumnicht and Schrubbe, but will deny the motion with respect to the claim against Lentz.

UNDISPUTED FACTS

## I.  The Parties

At all times relevant to this lawsuit, Tracy Anderson was a Wisconsin state prisoner, incarcerated at the Waupun Correctional Institution ("WCI").

Defendant Paul Sumnicht, M.D., was employed by the Wisconsin Department of Corrections ("DOC") as a physician at WCI from March of 2007 until October of 2012, when he transferred to the Green Bay Correctional Institution.

Defendant Belinda Schrubbe is the WCI Health Services Unit ("HSU") manager. She is not a physician.  Plaintiff maintains she nevertheless provides direct medical care to inmates and has the power to request surgical procedures on their behalf.  (Defs.' Reply DPFOF (dkt. #56) ¶¶ 4-5.)

Defendant Sergeant Jolene Lentz was a correctional sergeant at WCI from April of 2013 until January of 2014.  She is not qualified to provide medical health services to inmates at WCI, has no authority to override HSU decisions about medical restrictions and exercises no control over or input into HSU staff medical diagnostic and treatment decisions.  She also has no authority to establish or change an inmate's medical restrictions, unless told to do so by HSU.

## II. Inmate Medical Care Policies and Practices

Inmates may access non-emergency medical care by submitting a health services request ("HSR") form to HSU, contacting unit staff or speaking directly to medical staff making rounds.  Nurses triage these requests daily and schedule an inmate to go to sick call if his problem requires medical attention.  Schrubbe does not make triage decisions.  Rather,

if a nurse believes an HSR raises an issue to which Schrubbe needs to respond, the nurse will forward that request to Schrubbe.

Inmates can also access medical care by attending "sick call."  During sick call, qualified health care professionals assess inmates, provide treatment and schedule inmates for follow-up visits according to approved protocols and clinical priorities.  Nursing staff also make routine rounds for inmates in segregation, usually on a weekly basis.  During those rounds, nurses go to inmates' cellfronts to observe them and make sure they are responsive.

Finally, inmates who have an emergency situation can alert unit staff if they need to see a medical professional immediately.  Nurses may respond directly to the units when staff members contact them about an emergency.

DOC policy governs how institution health practitioners obtain approval to refer inmates offsite for non-emergency care.  If a physician determines that an inmate has a medical issue requiring him to go offsite to see a specialist or to receive a procedure that cannot be performed at the institution, the physician submits a "Class III" request to the Bureau of Health Services.  If the Class III request is approved, the physician is notified and the HSU staff will make an appointment for the inmate to be seen offsite by a consulting physician.  A consulting physician may make recommendations to the treating physician as to the course of care for that inmate, but the treating physician is not bound by a consulting physician's recommendation and may reject any or all of those recommendations in light of her own medical judgment, institutional concerns or other security concerns.

### III. Treatment of Anderson's Knee Injury

#### A. Injury in March of 2012[1]

On March 21, 2012, Nurse Gorske saw Anderson, who reported that his left knee "gave out" while playing basketball, causing pain to his left lateral to posterior knee. Anderson avers he also told Nurse Gorske that he heard something "crack" in his knee when it gave out. On examining his knee, Nurse Gorske found no swelling or joint space tenderness. The patella, or kneecap, floated freely, the ligaments were grossly intact, and there was no effusion -- that is, fluid leakage -- with range of motion. Noting that Anderson was already taking naproxen, a drug used to relieve inflammation, swelling, stiffness and joint pain, Nurse Gorske added acetaminophen in combination with Hydrocodone, known as "APAP," for additional pain relief. Almost two weeks later, on April 2, a different nurse gave Anderson an ACE wrap to hold an ice bag in place, which was intended to reduce lateral knee swelling as Anderson elevated his leg. Crutches permitted Anderson to walk until Dr. Sumnicht was able to see him.

#### B. Dr. Sumnicht's Initial Diagnosis

On April 6, Dr. Sumnicht saw Anderson for a follow-up to address his complaint of left lateral knee pain. He found no effusion in the left knee, no fluid wave, and no "ballotable patella" -- a condition signifying increased fluid over the patella. He did observe soft tissue swelling and slight bowleggedness causing lateral leg stress, although he noted that there was no bone soreness. Dr. Sumnicht also applied "Drawer" and "McMurray"

---

[1] Neither party provides details or proposes facts about the state of Anderson's knee before the basketball injury, but it appears from medical records that Anderson already was suffering from left knee pain and was taking naproxen before March 21, 2012. (*See, e.g.*, Decl. of Paul Sumnicht Ex. 101 (dkt. #43-1); 45 (Jan. 5, 2012 notation regarding "L knee pain"); 219 (naproxen refill request dated Feb. 29, 2012).)

tests, used to check for rupture of cruciate ligaments and tears in the meniscus of the knee, respectively.  Sumnicht found both tests were negative, although he noted that Anderson had a tender point over the lateral hamstring insertion.

Additionally, Dr. Sumnicht noted that Anderson's last left knee x-ray had occurred in July of 2011, concluding that a repeat x-ray would not help, since none of the support ligaments and tendons of the knee show up clearly enough to be of diagnostic use.  The previous x-ray had also demonstrated there was no problem with the bones of Anderson's knee, and the parties agree that it would be rare for a bone problem to develop in less than one year absent other physical findings.

Based on his examination, Dr. Sumnicht concluded that Anderson was suffering from a lateral hamstring pull with soft tissue swelling.  Having found no "internal derangement," he also concluded that Anderson did not need a brace, although he planned to continue the naproxen and ice to reduce the swelling.  In addition, Dr. Sumnicht found that Anderson's mild bowleggedness suggested a vitamin D deficiency, putting his knee at increased lateral stress.

Overall, Dr. Sumnicht determined that Anderson's use of crutches and failure to use the hamstring muscle to pump out the fluid had allowed the tendon and lateral soft tissues to swell.  Concluding that Anderson needed to begin stretching the lower lateral hamstring tendon, so that it would not tighten and create chronic knee pain, Dr. Sumnicht discontinued the crutches and told Anderson to walk slowly in order to begin stretching the tightening hamstring muscle tendon for rehab purposes.

### C. Early Follow-Up Appointments

Dr. Sumnicht followed up with Anderson on May 16, 2012, forty days after his first exam.  At that time, Sumnicht noted significant, but slow, improvement.  The hamstring tendon was sharply defined and not swollen, showing good tendon healing, and there was no joint fluid wave or effusion.  The internal knee ligaments were also intact.  However, the knee was puffy around the distal iliotibial band ("ITB"), which runs just in front of the lateral hamstring insertion, with swelling at the ITB bursa, a fluid-filled sac that functions as a gliding surface to reduce friction.  Dr. Sumnicht accordingly assessed iliotibial tract left knee bursitis, originally thought to be lateral hamstring insertion strain (the structures run close together at the knee).  He continued the naproxen and ice, told Anderson to do iliotibial band stretch exercises and instructed Anderson to do an exercise program in his cell.

Almost a month later, on June 12, Dr. Sumnicht again saw Anderson for continued monitoring of his left knee pain, noting that Anderson had done the exercise program and had limited flexion, or folding, of the knee.  Still, he found ACL laxity, with the left greater than the right, and noted that Anderson's gait did not fully extend his left knee.  Reapplying the Drawer test, Sumnicht found ½+ on the left, with tight iliotibial insertion on the left. A reapplication of the McMurray test yielded questionably positive signs.  Noting the lack of response to the exercise program, Dr. Sumnicht questioned whether Anderson had possible "internal arrangement" or a tight ITB.  He ordered a physical therapy evaluation of the left knee and prescribed naproxen twice a day as needed for one year for pain relief.

A week later, on June 19, Anderson submitted an HSR that read: "I am writing to ask you all is it normal for an injury to stay swollen two months after the injury occurred

6

because I injured my knee on April 2 and it's still swollen.  Could you tell me what and why is it still swollen?"  Defendant Schrubbe responded on June 20, writing that it was possible because Anderson continued to use the knee.  She also wrote that any slight twist could reinjure it, and that he should probably have it examined.  Schrubbe told him to write to the HSU if he wanted to be seen.

That same day, Anderson submitted an HSR asking about an MRI.  He wrote that he had seen the physician two weeks earlier, who wanted Anderson to see a therapist, and then he would get an MRI.  Schrubbe responded on June 21, stating that Anderson should first see the physical therapist, which could take one to two months, and that he should then see the doctor for follow-up.

### D. Treatment by Physical Therapist

Anderson had his initial PT evaluation on June 22.  The physical therapist noted that the evaluation revealed tenderness to palpation of the left knee medical and lateral joint line, as well as distal left ITB insertion.  Anderson had decreased right quad strength and increased swelling in the superior and lateral left knee, with "position (+) signs for ligamentous involvement."  Active range of motion was also decreased in the left knee.  The physical therapist found these signs and symptoms consistent with left knee sprain, but an ACL tear could not be ruled out.  Following this evaluation, the physical therapist made a care plan to see Anderson once a week for six weeks.

On July 4, Anderson submitted an HSR asking why his prescription muscle rub was not on the medicine cart.  He also asked when he would be seeing the therapist, claiming that his knee was painful and swollen and that he should have seen the therapist the

previous Friday.  The next day, Schrubbe responded that his prescription for the muscle rub had expired and that he was scheduled for an appointment with the therapist on Monday, July 9, 2012.  Anderson then engaged in physical therapy on July 9, 16 and 23 and August 6, 2012.  Anderson then did not attend his June 29 or August 27 appointments, but contends that he was never "called out" for them and so was not permitted to attend.

### E.  Additional Complaints and Treatment

Dr. Sumnicht followed up with Anderson again on October 1, 2012, now more than six months after his original injury.  According to Dr. Sumnicht, Anderson indicated that his knee had not given out recently.  Dr. Sumnicht also found that Anderson's walking was smooth and normal, and that the swelling in his knee was gone.  Still, Anderson reported that he was *not* walking normally and that he continued to experience excruciating pain, swelling and "water on the knee."  Dr. Sumnicht noted that the left knee pain was now under the patella, and he observed no edema.  Anderson did, however, have lateral hamstring and bursa soreness, and Dr. Sumnicht noted slight puffiness and swelling in the lateral hamstring.  Overall, Sumnicht found the exam was "confusing" and the McMurray test gave variable results.  He, therefore, assessed "chondromalacia" -- inflammation of the underside of the patella and softening of the cartilage -- and lateral hamstring strain with swollen insertion.  Contrary to Anderson's self-diagnosis, Dr. Sumnicht found no signs of water on the knee.  Accordingly, he continued the same treatment plan.

Although Dr. Sumnicht's treatment notes from the October 1 appointment also state in part, "c/o of pain needs MRI" (Paul Sumnicht Decl. Ex. 101 (dkt. #43-1) 19), he explained in his declaration that the notation was intended simply to record *Anderson's*

complaints that he needed an MRI because of the pain he was suffering.  (Defs.' PFOF (dkt. #42) ¶ 40.)  Dr. Sumnicht's own assessment, he maintains, was that Anderson did not need an MRI and that he could simply teach Anderson about causes of pain in the knee joint using an anatomy book, which is referenced in his notes, so that Anderson would better understand the chondromalacia.  Anderson contends that this is not the only inference to be drawn from this notation, suggesting that one could reasonably infer the note actually represents Dr. Sumnicht's contemporaneous assessment that an MRI *was* required.

Regardless, Anderson wrote an interview/information request later that same day, complaining that the doctor had refused to listen to him regarding his pain:  "You all continue to give me this medication and that's not what I want.  I've been on this naproxene (*sic*) since 2011 and I continue to experience the same pain.  I know there's water on my knee but this doctor continued to make things up as he go[es] along just to have reason not to give me a[n] MRI."  This request was referred to Schrubbe, who responded the next day that "only the doctor can determine what is medically necessary.  At this time, he does not believe a[n] MRI is medically necessary.  This new problem with your knee has only been since March 2012 (not 2011)."

After Dr. Sumnicht transferred to Green Bay Correctional Institution on October 6, 2012, he had no further involvement with Anderson's care.  For purposes of summary judgment, Dr. Sumnicht avers to a reasonable degree of medical certainty that he provided Anderson with appropriate medical care while at WCI.  Dr. Manlove apparently took over as Anderson's primary physician when Dr. Sumnicht left and was responsible for determining what course of treatment to pursue going forward.

Instead, on October 12, 2012, Anderson submitted an interview/information request claiming that medical staff did not listen to him and continued to misdiagnose his medical problem. Anderson wrote that he had "explained this pain I am experiencing to Ms. Lyons back in May 2011 and she prescribed me at this naproxen[] 500 mg per six months but I tried to tell her it's not that kind of pain and I continue to experience the pain. It's fluid on my knee. It feels like an electrical discharge in my knee. So this is my reason for refusing to attend the appointments." Nurse Larson responded, telling Anderson that HSU started with treatment like naproxen and therapy and would increase the treatments if those failed. She informed Anderson that the physician and an unidentified nurse practitioner agreed that he did not have water on the knee. Finally, she told him to continue to work with the physician and nurse practitioner.

Anderson submitted yet another HSR on October 15, writing, "I was told by Ms. Schrubbe on October 15, 2012 to put this request in for the fluid on my knee causing a shocking pain. This has been going on since 2011 . . . . Ms. Lyons prescribed me [n]aproxen[] 500 [mg], which hasn't helped and I tried to explain it to the Dr. but he wasn't hearing me because I'm still experiencing this pain." Schrubbe responded the next day, informing Anderson that he would be scheduled to see the doctor but it would probably take a month. She further reminded Anderson that his July 18, 2011, x-ray had been normal.

The parties do not address Anderson's actual treatment between October 15, 2012, and August 22, 2013 (when Dr. Manlove submitted a request for an outside orthopedic consult). However, the court's review of Anderson's medical records reveals that Anderson was seen fairly consistently throughout that time, at least by HSU nurses. (*See* Decl. of Paul

10

Sumnicht Ex. 101 (dkt. #43-1) 20 – 33.)  In addition, those records indicate that Anderson was seen by Dr. Manlove on June 7, 2013.  Moreover, what appear to be Manlove's notes at that time refer to Anderson's continued left knee pain and state that Drawer and McMurray test results were again negative.  (*Id*. at 31.)  They also indicate plans to "get x-ray" and "consider MRI."  (*Id*.)

### F.  Complaints and Treatment in May of 2013

On May 9, 2013, Anderson sent Schrubbe another interview/information request, again complaining about his knee.  He indicated that while he had complied with his therapy and was still taking vitamin D and naproxen, he was continuing to suffer "chronic distressful pain" due to the injury.  Schrubbe responded on May 29, informing Anderson that he had not given the knee enough time to rest "before re-injuring"[2] and that it could take several years without injury for the knee to heal.  Schrubbe advised Anderson not to play basketball or volleyball and informed him she would schedule a follow-up with the physician.

On May 14, Anderson submitted Offender Complaint WCI-2013-9590, complaining about the treatment he had received.  An Institution Complaint Examiner ("ICE") contacted Schrubbe for information related to Anderson's claims.  After reviewing Anderson's claims and the medical record, Schrubbe informed the ICE that Anderson had been seen by a nurse the same day he submitted his Complaint WCI-2013-9590.  According to Schrubbe, the nurse had instructed Anderson to continue to follow the

---

[2] The record is unclear as to what this reference to "re-injuring" means, although in his complaint Anderson alleged that on May 20, 2013, he further injured his knee after slipping and falling due to a broken sink in his cell.  (Compl. (dkt. #1) 9-10.)  Anderson was not granted leave to proceed on any claims regarding the broken sink.  (Jan. 21, 2014 Opinion & Order (dkt. #14) 11-12.)

11

physician's care plan and scheduled him for a follow-up.   Schrubbe also noted that Anderson had been seen on June 7, and an x-ray had revealed mild osteoarthritis.   Finally, Schrubbe informed the ICE that Anderson had received muscle rub and Tylenol for pain and that his concerns were being addressed.

### G.  Knee Brace and Surgery

On August 22, 2013, Dr. Manlove submitted a Class III request for approval of an orthopedic consult, as well as surgery if recommended.   The Class III request was approved on August 23, 2013, and Anderson was seen by Dr. Grossman at the Waupun Orthopedic Clinic on September 24, 2013.   After Dr. Grossman recommended surgery, Dr. Manlove signed off on it.[3]   Still, the HSU scheduler must wait for an opening in the surgery department at the outside hospital.   HSU staff cannot require off-site providers to see a patient on a given schedule, although Anderson contends that Schrubbe was responsible for finding an outside provider who can provide surgery promptly in the event the first-approached provider cannot.

Dr. Manlove also ordered an articulating knee brace on August 22.   A brace was issued and fitted the same day, but it was not the correct size.   On September 11, 2013, the physical therapist saw Anderson to measure him for a different ACL brace, which clerical staff ordered from an offsite vendor.

Special braces are often on back order and take a while to receive.   By October 4, 2013, Anderson still did not have his knee brace, and he submitted an HSR stating as much.   On October 14, an unidentified provider made a note in Anderson's medical record:

---

[3] More technically, Dr. Manlove apparently had to sign orders for surgery clearance, including history and physical, labs and other items.

"Knee brace ordered in September.  Called."  On October 17, Schrubbe told Anderson he was scheduled for surgery and his brace had finally shipped; she instructed him to contact her if he had not received the brace by the upcoming Friday.

Apparently, Anderson did receive the new brace at some point.  On November 5, however, he submitted another interview/information request, claiming that nursing staff had again ordered the wrong size brace.  Anderson also requested an extension on his medical restrictions until a properly-sized knee brace arrived.  In an HSR the next day, Anderson inquired why his surgery was taking so long.  He claimed that he continued to suffer pain and had never received his knee brace.  Schrubbe responded on November 8 that WCI did not have control over when an outside provider would see him.  She also advised Anderson that (1) his surgery was scheduled, and (2) his brace would be given to him that day.

Around this same time, Anderson refused to allow Nurse Waltz to draw blood for lab work, but claims he refused because Nurse Waltz would not tell him the reason for the draw.  Defendants contend Nurse Waltz actually gave Anderson *two* reasons for needed to draw his blood (hypertension and pre-surgical), but that Anderson nevertheless refused to comply.  On December 6, Anderson submitted an interview/information request asking why treatment for his knee injury was delayed.  Schrubbe did not respond until December 30, stating again that the surgery had been scheduled.

On January 2, 2014, Anderson had surgery at Waupun Memorial Hospital to repair his left knee anterior ligament tear with medial and lateral meniscus tears.  From the time he was injured playing basketball in March of 2012 until his surgery in January of 2014, Anderson was seen by WCI nursing staff at least eighteen times for treatment of his left

13

knee.  (Defts.' Reply DPFOF (dkt. #56) ¶ 86.)  He was seen an additional nine times by WCI physicians during that same period.  (*Id.* at ¶ 87.)  During the course of treatment, HSU nursing and physician staff provided a vast range of treatments, including medical exams and assessments, multiple types of pain medication, muscle rub, ace bandage wraps, ice and cold compresses, warm compresses, activity restrictions, crutches, an extra pillow, a Meals-on-Unit restriction, a knee brace, stretching exercises, physical therapy, and, eventually, an off-site orthopedic consultation, the desired MRI and surgery.  (*Id.* at ¶ 88.)

## IV. Alleged Denial of Ice and Medical Care

When an inmate receives a medical restriction, he is given a written copy and an additional copy goes to the cell hall via institution mail.  Inmates are required to post medical restrictions by their cell doors so staff can see them.  If an inmate has a medical restriction for ice, he receives a small, clear ice bag from HSU bearing his name and DOC number.  To receive medical ice, the inmate must request it from inmate tier tenders, who will refresh the bag.  If an inmate asks an *officer* for ice, the officer likewise forwards the request to the inmate tier tenders.  The provision of ice is not documented, but medical ice is provided at medication pass times -- morning (AM), noon (12:00 p.m.), night (PM) and/or bedtime (HS), unless the restriction directs otherwise.

According to Anderson, on October 1, 2013, three months before surgery, his knee gave out while he was in his cell, and he fell to the ground.  (*See* Pl.'s Resp DPFOF (dkt. #51) ¶ 121.)  He avers that he asked Lentz to inform medical staff so he could receive medical attention, but that she refused.   (Aff. of Tracy Anderson (dkt. #52) ¶ 10.)

14

Anderson also avers that he asked Lentz for ice at that time, but that she refused that request as well.  (*Id.*)

Defendant Sgt. Lentz does not specifically remember this incident, but based on her review of the records, Anderson's restriction provided for ice three times per day.  An inmate with an order providing for ice three times per day would receive his ice during the morning, noon and night medication pass.  Since 8:00 p.m. would fall within the bedtime medication pass, to Lentz's knowledge, Anderson would not have been authorized to receive ice at that time.[4]  Lentz indicates that if Anderson had asked for ice at 8:00 p.m., she would have checked his HSU medical restrictions to determine whether to give him ice.  Of course, this does not explain Anderson's claim that she refused his request to contact medical staff about his fall.  (Aff. of Tracy Anderson (dkt. #52) ¶ 10.)

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once this initial burden is met, however, the nonmoving party must "go beyond the pleadings" and "designate specific facts" supporting its position on any issue on which that

---

[4] Anderson purports to dispute this fact, but premises it on his apparent assumption that night and bedtime medication passes are the same thing.  According to defendants, that is not the case.

15

party will bear the burden of proof at trial. *Id.* at 324 (internal quotation marks omitted). Moreover, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If it fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323.

Anderson's claims are all premised on the Eighth Amendment right to be free from cruel and unusual punishment. The Eighth Amendment affords prisoners a constitutional right to medical care. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citations and quotation marks omitted). "The second requirement follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.' To violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind.' In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety[.]" *Id.* (internal citations omitted).

At summary judgment, defendants do not dispute that Anderson's torn anterior cruciate ligament was a serious medical need (and indeed, there is at least a triable issue of fact on that question, given Anderson's repeated complaints of excruciating pain). *See*

16

*Gaston v. Ghosh*, 498 F. App'x 629, 632 (7th Cir. 2012) (knee injury was a serious medical condition for purposes of screening); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (medical condition may be serious when it "significantly affects an individual's daily activities" or results in "the existence of chronic and substantial pain") (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992)).  Thus, the only question for this court is whether Anderson has come forward with sufficient evidence for a reasonable trier of fact to find that defendants behaved with deliberate indifference to that need.  On this record, the answer is "no."

## I.  Burden of Proof

"The test to determine whether a prison official acted with 'deliberate indifference' is a subjective one: '[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety[.]"  *Snipes*, 95 F.3d at 590 (quoting *Farmer*, 511 U.S. at 837).  "Mere negligence or even gross negligence does not constitute deliberate indifference."  *Id.*  For that reason, "the Eighth Amendment is not a vehicle for bringing claims for medical malpractice."  *Id.*; *see also Wade v. Castillo*, 658 F. Supp. 2d 906, 910 (W.D. Wis. 2009) ("The standard for medical malpractice is significantly lower than that for the Eighth Amendment.").

Accordingly, an inmate is not entitled to the treatment of his choice, nor is he entitled to the best care possible.  *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).  He is "entitled only to 'adequate medical care.'"  *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)).

17

Thus, a mere disagreement with a medical provider as to the proper course of treatment does not state a cognizable Eighth Amendment claim.  *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

As a matter of law then, "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'"  *Snipes*, 95 F.3d at 592 (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)).  In addition, a defendant can only be held liable for deliberate indifference if he or she was *personally* involved in the allegedly unconstitutional treatment.  *See Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (claims under § 1983 require personal involvement).  At the same time, prison officials may not "doggedly persist[] in a course of treatment known to be ineffective."  *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005); *see also Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (physicians are "obligated not to persist in ineffective treatment").

**II. Alleged Failure to Order MRI**

With respect to the specific claims against Dr. Sumnicht, he was Anderson's doctor from the time of Anderson's basketball injury in March of 2012 until he transferred to a different correctional facility on October 6, 2012.  He appears to have had no involvement in Anderson's care after that time.  (There is no indication who ordered x-rays and prescribed Anderson napoxen in July of 2011, but even if it was Dr. Sumnicht, Anderson has not contended that any of the treatment preceding his basketball injury constituted

deliberate indifference.)   Similarly, Dr. Manlove, whom Anderson did not name as a defendant, took over as his physician when Sumnicht left in October 2012.

Anderson acknowledges receiving extensive treatment for his knee injury under Dr. Sumnicht's care, including pain medication, compresses, bandages, stretching exercises, activity restrictions, crutches and physical therapy.   Nevertheless, Anderson contends that Dr. Sumnicht persisted in a blatantly inappropriate course of treatment despite knowing that he needed an MRI to assess his knee.   (*See* Pl.'s Br. Opp'n (dkt. #50) 7.)   As the Seventh Circuit recognized in *Greeno*, an "obdurate refusal to alter [an inmate's] course of treatment" despite subjective awareness that the treatment is not working can support a deliberate indifference claim.   414 F.3d at 654.   The problem is that the record does not support Anderson's claim with respect to Dr. Sumnicht's behavior.

In April, when Dr. Sumnicht first saw Anderson after his injury, he performed tests to check Anderson's knee for ruptured cruciate ligaments and meniscal tears.   Anderson does not dispute that those test results were negative, nor does he offer any evidence to suggest that Dr. Sumnicht had any reason to believe (or *did* believe) the test results were wrong.   Based on his medical assessment, Dr. Sumnicht diagnosed a lateral hamstring pull and discontinued Anderson's crutches so as to stretch the lower lateral hamstring tendon, while continuing the naproxen and ice to reduce the swelling.   Nothing about this first appointment evinces deliberate indifference to Anderson's injury.   At most, it shows that Dr. Sumnicht's initial diagnosis was mistaken, which does not rise to the level of deliberate indifference.   Indeed, even culpable negligence would not fulfill that burden.   *See Steele v. Choi*, 82 F.3d 175, 178 (7th Cir. 1996) (courts must distinguish between deliberate indifference and negligence in diagnosing or treating a medical condition).

19

Dr. Sumnicht next saw Anderson a little more than a month later, on May 16. At that time, he noted "significant but slow improvement" in Anderson's condition. Dr. Sumnicht also noted puffiness around the distal ITB (located close to the hamstring insertion) and swelling at the ITB bursa. He diagnosed iliotibial tract left knee bursitis, continued the naproxen and ice and prescribed Anderson ITB stretch exercises and an exercise program. Again, Anderson can point to no evidence suggesting that Dr. Sumnicht had reason to know that this course of treatment was "blatantly inappropriate" -- quite the reverse, given that Dr. Sumnicht's notes reflect *improvement* in Anderson's condition.

On June 12, Dr. Sumnicht saw Anderson and determined he had limited flexion in his knee despite the stretching program. After again performing tests, he found "questionably" positive signs. Presumably, at this time, Dr. Sumnicht *could* have ordered an MRI in light of the test results. Instead, he decided to order a physical therapy evaluation of Anderson's knee to assess whether he had internal arrangement or a tight iliotibial band. Even though Dr. Sumnicht's diagnoses would later prove to be wrong, nothing in the record suggests that this decision was outside the realm of reasonable treatment either. In *Zackery v. Mesrobian*, 299 F. App'x 598 (7th Cir. 2008), for example, the Seventh Circuit similarly found that a prison physician, Dr. Mesrobian, was entitled to summary judgment despite misdiagnosing a torn meniscus in inmate's knee as osteoarthritis. Specifically, the court found Zackery "submitted no evidence that would allow a reasonable fact-finder to conclude that Dr. Mesrobian's decisions were based on anything other than medical judgment. . . . Although it may have been prudent for Dr. Mesrobian to order diagnostic testing in 2001, his failure to choose the best course of action does not amount to a constitutional violation." *Id*. at 600-602.

The physical therapist then proceeded to evaluate Anderson in accordance with Dr. Sumnicht's order on June 22, noting that Anderson's symptoms were "consistent" with left knee sprain, and set a six-week care plan to treat Anderson's knee.  That the physical therapist "could not rule out" an ACL tear at that time does not establish that the therapist or Dr. Sumnicht *knew* that Anderson had sustained such an injury.  Indeed, even if the therapist had gone further and opined that an ACL tear was *likely*, Dr. Sumnicht's disagreement with that opinion is not enough to show deliberate indifference without some evidence suggesting his position was based on something other than the exercise of medical judgment.  *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014) (approving recommendation of physical therapy from one specialist rather than surgery from all other specialists did not constitute deliberate indifference "where both recommendations are made by qualified medical professionals"); *Zackery*, 299 F. App'x at 601 (noting "a difference of opinion among physicians is insufficient to establish deliberate indifference"); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (difference of opinion between physicians as to seriousness of inmate's arthritis "at the very most amounts to medical malpractice").  Even if Dr. Sumnicht had reason to suspect that a torn ACL was a possible explanation for Anderson's continued knee pain, his decision to try physical therapy first cannot be considered deliberate indifference, at least not on this record.

Anderson then saw the physical therapist for further treatment on July 9, 12, and 23 and again on August 6.  While he missed two appointments -- allegedly because he was not called for them (Aff. of Tracy B. Anderson (dkt. #52) ¶ 5) -- there is again no evidence that Dr. Sumnicht played any part in this denial of treatment.

21

Having completed at least a majority of his scheduled physical therapy, Anderson attended his final appointment with Dr. Sumnicht on October 1.   Crediting Anderson's affidavit, he was not walking normally that day and his knee was still swollen, despite Dr. Sumnicht's notes to the contrary.   (*Id.* at ¶ 6.)   Dr. Sumnicht's notes also confirm that Anderson complained of continued pain that day as well.   Still, according to Dr. Sumnicht, the McMurray test he performed that day yielded variable results, the physical exam was "confusing" and Sumnicht ultimately diagnosed "chondromalacia," along with a lateral hamstring strain.

The one piece of evidence on which Anderson relies at this point is the notation in his medical records reading "c/o of pain, needs MRI."   According to Anderson, that note demonstrates that Dr. Sumnicht *knew* an MRI was necessary, although Dr. Sumnicht maintains that his clinical assessment at the time was that Anderson did not need an MRI and that his notes were meant to reflect *Anderson*'s "emphatic assessment" that he needed an MRI.   (Decl. of Paul Sumnicht (dkt. #43) ¶ 25.)[5]

An inference that "c/o" pain or "complained of pain" referred to Anderson's complaint, while the next words "needs MRI" referred to Dr. Sumnicht's own assessment, is not wholly unreasonable on this record, though it is hardly compelling.   Dr. Sumnicht had already altered his diagnosis multiple times and noted that the results of the physical examinations he had performed were "variable" and "confusing."   In light of the difficulty of pinning down an explanation for Anderson's continued knee pain, it is at least plausible that Dr. Sumnicht may have concluded that an MRI was necessary, although his own

---

[5] Even a cursory online search strongly suggests that in medical circles, "c/o" is generally recognized as an abbreviation for "complains of."   MEDILEXICON,   www.medilexicon.com/medicaldictionary. php?t=18507 (last visited June 28, 2015).

recollection, failure to order one and the note's proximity to Anderson's complaint of pain all strongly suggest otherwise.

Even presuming Anderson's interpretation of the notes is correct (as the court will for purposes of summary judgment), Dr. Sumnicht's remaining actions still do not rise to the level of deliberate indifference.  The notes do not suggest that Dr. Sumnicht *knew* Anderson might have a torn ACL.  On the contrary, he *assessed* chondromalacia and chose to continue the same course of treatment in light of this assessment.  Anderson presents no evidence that this diagnosis, although incorrect, was negligent, much less evidence of deliberate indifference.    Indeed,  anti-inflammatory  drugs  are  an  accepted  treatment  for chondromalacia.  *See* Robert K. Ausman, M.D. & Dean E. Snyder, J.D., 3 *Medical Library Lawyer's Edition*, § 4:51(b) (1989).

Assuming Dr. Sumnicht also believed that Anderson needed an MRI -- whether to confirm his assessment or rule out other causes -- there is again no evidence that it constituted deliberate indifference to continue Anderson on his current course of treatment before resorting to that test, particularly since Anderson's knee *had*, at least in Dr. Sumnicht's medical judgment, shown some improvement.[6]  Said another way, there is nothing on this record that would permit the court to conclude the treatment Anderson received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition."  *Greeno*, 414 F.3d at 654 (quoting *Snipes*, 95 F.3d at 592).

---

[6] In fairness, Anderson's affidavit states that it was not until after surgery that he experienced any "real improvement" to his knee.  (Aff. of Tracy Anderson (dkt. #52) ¶ 9.)  And at summary judgment, the court must assume that to be true, but Anderson is not qualified to testify that his knee did not improve, medically speaking, nor is he qualified to testify that he had "water on the knee."  In the end, he offers no expert medical testimony putting Dr. Sumnicht's judgment into doubt.

Had Dr. Sumnicht noted that an MRI was required and then refused to order it, while ignoring Anderson's continued complaints of pain over an extended period of time, this might be a closer question. *Cf. Greeno*, 414 F.3d at 655 ("The possibility of an ulcer was first noted in Greeno's chart in August 1995.   For the next year-and-a-half the defendants doggedly persisted in a course of treatment known to be ineffective[.]").   But this is the final problem with Anderson's claim against Dr. Sumnicht:  he was transferred to a different correctional institution on October 6, less than a week after writing "c/o of pain needs MRI" in Anderson's medical file.   No reasonable factfinder could infer deliberate indifference solely on the strength of the five days Dr. Sumnicht had to pursue the MRI testing before Anderson was no longer his patient.

Nor does Anderson have the sort of "reinforcing" evidence that was present in *Greeno.* While Anderson would analogize his case to *Greeno,* the treating doctor in that case entered a "directive that Greeno was to receive '*no* pain medications' and '*no* gastroscopy' (emphasis in original)," which "reinforce[d] Greeno's theory that the repeated refusal to uncover or effectively treat his condition was a 'gratuitous cruelty.'"   *Id.*   Dr. Sumnicht did no such thing.   On the contrary, he prescribed various medications, and attempted varied treatments, to relieve the pain and address its underlying cause.   Also in stark contrast, a defendant nurse in *Greeno* sent the plaintiff ibuprofen, even though ibuprofen was known to aggravate ulcers and the defendants were aware ulcers were a possibility.   That same nurse also warned Greeno that if he continued to "hassle" the Health Services Unit staff about his condition, he would be "locked up."   *Id.* at 654.   Again, Anderson points to nothing approaching similar behavior by Dr. Sumnicht or any other defendant.

24

Again, the present case is more akin factually and legally to the Seventh Circuit's previously discussed decision in *Zackery v. Mesrobian*, which an inmate injured his knee and eventually began to complain of chronic knee pain. 299 F. App'x at 599. The first specialist to examine him suspected that Zackery had a torn medial meniscus and recommended to Dr. Mesrobian that Zackery receive an MRI or arthroscopic examination. *Id.* at 600. Over the following months, Dr. Mesrobian examined Zackery several times and instead diagnosed him with osteoarthritis and prescribed medication for that illness without ordering the recommended tests. *Id.* Zackery complained of knee pain again in April of the next year, and once again an outside specialist recommended an MRI or arthroscopic examination based on suspicions of a torn medial meniscus. *Id.* Yet again, Dr. Mesrobian disagreed, remaining convinced that Zackery had osteoarthritis, causing him to prescribe physical therapy. Eventually, the outside specialist also changed his diagnosis to osteoarthritis.

Even after Zackery completed the prescribed therapy, he complained of knee pain, and continued to do so throughout subsequent treatments the doctors tried -- including medication, bedrest and strengthening exercises -- none of which yielded any improvement. *Id.* Eventually, Dr. Mesrobian sent Zackery to the University of Illinois, where doctors performed an MRI and diagnosed a torn meniscus, just as the first specialist had initially suspected. *Id.* Nearly four years after he sustained the original injury, Zackery finally received the operation and pain relief he desired. *Id.*

The Seventh Circuit nevertheless affirmed the lower court's entry of summary judgment in Dr. Mesrobian's favor. The court explained that Zackery had "presented no evidence that Dr. Mesrobian's diagnosis and chosen course of treatment were so far afield of

25

accepted professional standards as to raise an inference of deliberate indifference." *Id.* at 601.   Nor had Zackery presented evidence that Dr. Mesrobian's decision to forego the recommended diagnostic tests was deliberate indifference, particularly in light of the physician's affidavit that he had concluded Zackery's injuries were not significant enough to warrant further testing.   *Id.*   In light of the totality of care Dr. Mesrobian provided, including twenty examinations, x-rays, medication, physical therapy and bedrest, the court concluded that "[a]lthough it may have been prudent for Dr. Mesrobian to order diagnostic testing in 2001, his failure to choose the best course of action does not amount to a constitutional violation." *Id.* at 602.

Just as did the defendant physician in *Zackery*, Dr. Sumnicht:  examined Anderson multiple times; tried several forms of treatment, including naproxen, physical therapy, stretching exercises, ice and vitamin D; and, at the earliest, *might* have concluded an MRI was necessary less than a week before he was discontinued as Anderson's physician.   While earlier diagnostic testing may have been the more prudent course, a reasonable factfinder could not find that the failure to order MRI testing earlier constituted deliberate indifference, at least not on this record.   Indeed, in *Zackery*, the Seventh Circuit found the failure to order an MRI for an injured knee was not enough to prove deliberate indifference by the treating physician, even in the face of a conflicting opinion from a specialist and years of unsuccessful treatment.   *See Zackery*, 299 F. App'x at 601.   Additionally, once Dr. Manlove took over as Anderson's physician, he, too, performed Drawer and McMurray tests with negative results, suggesting that Anderson's injury was not obvious (and, in turn, that Dr. Sumnicht did not abandon his medical judgment in failing to diagnose it earlier).   (*See* Decl. of Paul Sumnicht Ex. 101 (dkt. #43-1) 31.)   Indeed, even after another eight months

of alternative treatment, Dr. Manlove did not immediately order an MRI, but only another x-ray.   Accordingly, defendant Dr. Sumnicht is entitled to summary judgment on these claims.[7]

## III. Alleged Failure to Order Knee Brace

Anderson's separate claims regarding a delay in receiving a proper knee brace require little discussion.   At screening, the court noted that the delay in receiving a knee brace appeared to have been caused entirely by third parties and that Anderson could proceed only "to the extent Dr. Sumnicht or Health Manager Schrubbe are alleged to have been deliberately indifferent to the severity of Anderson's injury and should have expedited use of a satisfactory knee brace."   (Jan. 21, 2014 Opinion & Order (dkt. #14) 9-10.)   The court has already concluded that Dr. Sumnicht was not deliberately indifferent to Anderson's knee condition in failing to order an MRI.   Similarly, even if he *should* have recognized the need for a brace earlier, the record does not allow for the inference that he *did* in fact recognize that need.   Nor has Anderson offered expert medical testimony to cast doubt on Dr. Sumnicht's initial conclusion that Anderson did not need a knee brace.   There is likewise no evidence that Schrubbe played any role in ordering the brace once Dr. Manlove prescribed one.   Finally, all the evidence in the record indicates the delay in receiving the

---

[7] Anderson also appears to suggest in his brief that WCI's Health Services Unit Manager Schrubbe should have intervened in his care *in general*, and that Schrubbe's failure to do so constitutes deliberate indifference.   Anderson was not granted leave to proceed on that claim because his complaint itself stated she had "withheld" and "deprived" him of medical care, which was contradicted by the treatment records Anderson attached to his complaint.   Furthermore, the record does not reveal that Schrubbe had any reason to doubt the adequacy of Dr. Sumnicht's treatments and certainly no facts permitting a finding that her deference to Dr. Sumnicht's medical opinions constituted deliberate indifference.   Nor has Anderson proposed any facts or pointed to any evidence from which a reasonable jury could infer Schrubbe behaved with *deliberate indifference* after Dr. Sumnicht left.   Anderson continued to receive treatment from nurses and Dr. Manlove, and Anderson has pointed to no evidence suggesting that treatment was so blatantly inappropriate that Schrubbe as a non-medical staff person was legally obligated to intervene.

brace was due *first*, to the outside provider, and *second*, to the need to order yet another new brace when the first special-ordered brace did not fit properly. (*See* Defs.' Reply DPFOF (dkt. #56) ¶¶ 65-80.) Consequently, there is no evidence that Schrubbe acted, or failed to act, with a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Accordingly, defendants are entitled to summary judgment on those claims as well.

## IV. Alleged Delay in Knee Surgery

Next, Anderson was granted leave to proceed on a claim that Schrubbe behaved with deliberate indifference when she delayed his knee surgery. As the court noted at screening, "[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.* (citations omitted).

Anderson's knee injury was undoubtedly painful, though not life-threatening. The problem with Anderson's claim is that the delays in surgery again appear to be the result of scheduling difficulties, not Schrubbe's disregard of Anderson's condition. As of August, 2013, Dr. Manlove had submitted a request for an orthopedic consult; by September 24, the outside specialist had recommended that Anderson undergo surgery. Anderson's surgery was scheduled at an outside hospital by October 17, and he underwent that surgery on January 2, 2014. As a result, it is undisputed that on this record slightly more than three months passed between the surgery recommendation and the surgery itself, and that delay appears to have been a function of the hospital's schedule. *See id.* Moreover, there is no

evidence that a three-month delay in surgery was medically unreasonable, particularly in light of the fact that HSU staff were working to acquire a brace for him pending that surgery (and the medical records show that he continued to receive ice and pain medication pending surgery as well).  (Decl. of Paul Sumnicht Ex. 101 (dkt. #43-1) 50-51.)

Even if this delay were actionable, Anderson does not claim that Schrubbe herself actually intervened to *delay* his surgery -- just that she (1) was aware it was delayed and (2) failed to locate a different hospital that could perform the surgery more quickly.  This does not rise to the level of deliberate indifference, at least not on this record.  *First,* there was no delay in terms of *approving* the surgery, once recommended: Dr. Manlove did so on September 25, the day after the consulting specialist recommended it.  (Decl. of Paul Sumnicht Ex. 101 (dkt. #43-1) 50.)  *Second,* arranging for knee surgery at an outside hospital is relatively difficult, in terms of ease of providing treatment.  *See McGowan*, 612 F.3d at 640.

Deliberate indifference requires that a defendant fail to take "reasonable measures" to abate a risk of harm.  *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997).  Without any medical evidence suggesting that a three-month delay was unreasonable, the court cannot say that Schrubbe's failure to locate a faster hospital constitutes a failure to take "reasonable measures" in response to Anderson's condition.

## V. Alleged Failure to Respond to Cries of Pain

Finally, Anderson was granted leave to proceed on a claim against Sergeant Lentz, whom he alleges overheard his cries of pain on October 1, 2013, after his knee "gave out," but refused to contact HSU staff or bring him medical ice.  Anderson requested ice around

8:00 p.m., which falls during the bedtime pass, and his medical restrictions dictated he was entitled to ice only three times a day, during morning, noon and night medication passes. "[N]on-medical defendants [are] entitled to rely on the professional judgment of medical prison officials" so long as nothing makes it obvious that the care prisoners are receiving is inadequate. *Hayes v. Snyder*, 546 F.3d 516, 527-28 (7th Cir. 2008). Ordinarily then, Lentz would be entitled to rely on the HSU prescription in deciding not to give Anderson extra ice on October 1.

According to both Anderson and his cellmate Terry Phillips, however, Anderson's knee was not just painful -- it actually "gave out" that night, causing him to fall to the floor of his cell. (Aff. of Tracy Anderson (dkt. #52) ¶ 10; Aff. of Terry Phillips (dkt. #53) ¶¶ 3, 5.) Crediting Anderson's affidavit on summary judgment, Lentz apparently knew that Anderson's knee had given out entirely. That kind of change in his condition could well suggest to a layperson that regularly prescribed ice the following morning, when next called for, would be inadequate. Coupled with Lentz's alleged failure to contact HSU staff *at all*, this evidence is sufficient for Anderson's claim against Lentz to survive summary judgment.

## ORDER

IT IS ORDERED that defendants' motion for summary judgment (dkt. #40) is GRANTED with respect to defendants Paul Sumnicht and Belinda Schrubbe and DENIED with respect to defendant Jolene Lentz.

Entered this 7th day of July, 2015.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge

30